EDWARD C. HAWKS *vs.* AUGUSTUS W. LOCKE.

Franklin.   Sept. 16, 1884. — May 7, 1885.   C. ALLEN & COLBURN, JJ., absent.

By an accident to a freight train on the Troy and Greenfield Railroad, (then operated by the Fitchburg Railroad Company under a contract, by the terms of which the manager of the first-named road was authorized, in case of an accident thereon, to direct the clearing of the road, when necessary to prevent delay to other roads,) a large number of swine were let loose from the train, and scattered on and about the tracks. The manager directed his servants to collect them, and put them in a safe place. The servants took them to the barn-yard of the plaintiff, in his absence and without his license. On his return, he did not assent or object. He was asked to feed the swine, and did so, and collected a few of them himself, placing them in his yard   Afterwards he assisted in taking them away, and sent a bill for food and services, and for the damage done to his grass. Neither the plaintiff nor the manager knew that the swine were diseased at the time they were in the plaintiff's yard, but it afterwards appeared that the swine were then diseased, and that the disease was communicated to the plaintiff's swine a few minutes after the swine were placed in his yard. *Held*, in an action against the manager for the loss thus sustained, that the manager acted within the general scope of his authority. *Held, also*, that it could not be ruled, as matter of law, that the manager had been guilty of a trespass, and was liable for the loss of the plaintiff's swine.

HOLMES, J.   By an accident, on August 12, 1881, to a freight train on the Troy and Greenfield Railroad, which was then

operated by the Fitchburg Railroad Company, under a contract hereinafter referred to, about one hundred and seventy swine were let loose from the train, and were scattered about and on the track. The defendant, the manager of the first-named railroad, took charge of clearing up the wreck, and ordered his section-master to collect the swine, and put them in a safe place. A part of the swine were thereupon driven to the plaintiff's barnyard at about half-past five, and a part later in the afternoon, the plaintiff being absent from home, and having given no license to put them there. At about seven, the plaintiff returned home, heard what was being done, and saw the men driving some of the swine towards his yard, but neither assented nor objected, and he made no objection at any time to the swine remaining in his yard. Two hours later, he was asked to feed the swine the next morning, which he agreed to do, and did. He also collected and placed a few of the swine in his yard, and, later, assisted in taking the swine away for shipment. Soon after, he sent a bill, for food, services, and the damage done to his grass, to a person understood to be an agent of the defendant.

It afterwards turned out that the swine were diseased, and the disease was communicated to the plaintiff's swine within a few minutes after the diseased animals were put into his yard. The plaintiff has suffered great loss, and now sues, alleging a trespass upon his premises by the defendant's servants, and consequential damages. The case was tried without a jury.

The defendant asked the court to rule, among other things, that, "if the plaintiff, upon learning that the swine were upon his premises, made no objection to their remaining there, or consented to their remaining there, and afterwards for a consideration fed and cared for them while they remained there, such conduct on his part would amount to a waiver of the trespass in putting them there, or be equivalent to a prior license to put them there, unless there was some concealment or fraud on the part of the defendant."

The court refused to rule as requested, and ruled "that the defendant was acting in the general scope of his employment as manager when he gave his said order to his section-master, and that his employees were acting in the general scope of their

employment by him as manager when they placed the Western swine on the premises of the plaintiff; that they committed a trespass in doing so, and that the manager, as master, is liable for the damages accruing to the plaintiff in consequence of this trespass, as a proximate cause, including the particulars of damage above assessed, and that the plaintiff did not in any way waive or lose his claim against the defendant for such damages;" and found for the plaintiff.

Taking this ruling with the request, we must construe it as laying down, as matter of law, that nothing in the evidence would take the case out of the category of trespass. We are of opinion that this was erroneous. We think that at least a possible view of the defendant's acts is, that they were done under an implied offer to pay for the accommodation furnished, and that when that offer was subsequently accepted, which there is ample ground for saying that it was, the contract then made applied to everything that had been done upon the defendant's land. We do not mean that the contract operates by way of accord and satisfaction for the trespass, although we should be' slow to deny that an executory contract might do so in these days, if so intended. But we should rather say that the legal character of the acts remained doubtful until the question of contract or no contract was settled, the law neglecting the short interval, as it sometimes does, to avoid an intolerable technicality, and treating the contract as if made from the beginning. See *Cartwright* v. *Wilmerding*, 24 N. Y. 521, 533.

Take the case of a traveller driving along the highway, who, seeing that his horse and himself need rest and food, drives into a private barn, and, finding no one there, puts his horse into a stall, gives it some hay, and then walks into the neighboring house and awaits the return of the owner, intending to ask him for a meal, and expecting to pay for all that he receives. If the owner returns and assents, it would be monstrous to say that afterwards he could turn round and sue the traveller in trespass. See *Briggs Iron Co.* v. *North Adams Iron Co.* 12 Cush. 114. The law will readily imply a license for acts in accordance with the general habits of the community. *Lakin* v. *Ames*, 10 Cush. 198, 220. And the objection stated in the year books, that " then by that color my enemy may be in my house and kill

me," Y. B. 12 Hen. VIII. 2, pl. 2, scarcely retains its old force. We may add, that, if a contract be found to have been made, its operation as a license will not be limited to the party with whom the contract was made, even if it be regarded as made with the Fitchburg Railroad Company; and although it be found at the same time that the swine were put on the plaintiff's land on behalf of the Commonwealth also, the license will cover the whole act.

If the foregoing view of the case be adopted, the fact that the swine were diseased when they were put upon the plaintiff's premises will not make the defendant liable. No decision, so far as we know, has gone further than to hold persons answerable if they knew that the animals were diseased, which neither the defendant nor his agents did in the case at bar. *Cooke* v. *Waring*, 2 H. & C. 332. *Hite* v. *Blandford*, 45 Ill. 9. See *Penton* v. *Murdock*, 18 W. R. 382; *S. C.* 22 L. T. (N. S.) 371; *Jeffrey* v. *Bigelow*, 13 Wend. 518; and especially *Hill* v. *Balls*, 2 H. & N. 299; *Minor* v. *Sharon*, 112 Mass. 477, 487.

It was strongly argued for the defendant, that the acts complained of were not within his authority as manager. But we do not feel prepared to adopt that view. By the contract of August 14, 1880, made under the St. of 1880, c. 261, § 2,* between the then manager and the Fitchburg Railroad Company, " in case of accident on the Troy and Greenfield Railroad, said manager shall have the right to direct the clearing of the road when necessary to prevent delay to other roads." It is admitted that the manager was authorized to take charge of the wreck in this case for the purpose of clearing the track. In order effectually to clear the track of living animals that might wander back if left at large, it was proper to shut them up in some safe place. No doubt, in ordering this to be done, the manager may have had in mind the forwarding of the swine, as well as keeping them off the track. But such a double purpose, if it existed, was one of the necessities of the case, and did not take the act

---

* This section provides that "the manager of the Troy and Greenfield Railroad, by direction of the Governor and Council, may contract with any railroad corporation or corporations for the operation of the Troy and Greenfield Railroad and Hoosac Tunnel by said corporation or corporations for a term not exceeding seven years."

out of the powers conferred on the manager. He did not cease to act for the State, even if he acted for the Fitchburg Railroad Company in driving the swine on the plaintiff's land. If it should be found that a contract was made with the latter, that would not affect the present question.

Again, it is said that these powers are limited to what was necessary to prevent delays on other roads. We cannot say, as matter of law, that more was done than was necessary, and the judgment of the experts on the spot is shown by what was done. Furthermore, a power to act in an emergency is to be construed with a certain degree of liberality, and we are to regard, not only that which may prove to have been necessary upon a review of the situation in cool blood, but what would naturally seem so in the hurry and excitement of the moment, when the parties had to act. See *Lawrence* v. *Minturn*, 17 How. 100, 110.

For these reasons, without any more critical examination of the contract and acts of the Legislature, we are of opinion that the court was right in ruling that the manager acted within the general scope of his authority. But, upon the other ground that has been stated, there must be a new trial.

*New trial ordered.*

*J. A. Aiken*, for the defendant.
*H. Winn*, for the plaintiff.