PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

MELVIN M. TAYLOR,

*Defendant-Appellant.*

No. 10-4234

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Richard L. Williams, Senior District Judge.
(3:09-cr-00249-RLW-1)

Argued: September 23, 2010

Decided: November 4, 2010

Before WILKINSON, Circuit Judge, HAMILTON,
Senior Circuit Judge, and Robert J. CONRAD, Jr.,
Chief United States District Judge for the Western District
of North Carolina, sitting by designation.

Affirmed by published opinion. Judge Wilkinson wrote the
opinion, in which Senior Judge Hamilton and Judge Conrad
joined.

## COUNSEL

**ARGUED**:Paul Geoffrey Gill, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Richmond, Virginia, for Appellant. Richard Daniel Cooke, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee. **ON BRIEF:** Michael S. Nachmanoff, Federal Public Defender, Alexandria, Virginia, for Appellant. Neil H. MacBride, United States Attorney, Alexandria, Virginia, Michael A. Jagels, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.

---

## OPINION

WILKINSON, Circuit Judge:

This case involves a police officer's efforts to reunite an abandoned four-year-old girl with her parents. We agree with the district court that the officer's actions were objectively reasonable and justified by the exigent circumstances stemming from her abandonment. Because the officer discovered Melvin Taylor and the firearm he was not permitted to possess in the course of a reasonable and commendable attempt to locate the child's parents, guardian, or caretaker, we affirm the denial of Taylor's motion to suppress.

I.

On May 1, 2009, Officer Anthony Ratliff of the Richmond Police Department responded to a late-morning radio call regarding a four-year-old girl who was wandering along a busy street and whose parents could not be found. When Ratliff arrived at the girl's reported location, a cab driver waved him over to a parking lot. The girl was sitting in the back seat of the cab.

The cab driver had found the little girl walking up and down the street alone. After he stopped his cab, he asked her where she lived, and the girl pointed out a nearby row house where she proceeded to lead the driver. The unit's front door was open so the driver stepped inside to determine whether anyone was home. When no one responded to his loud query, he took the girl back to his cab and called the police.

When Ratliff took custody of the girl, she led him to the same row house that the cab driver pointed out. Ratliff asked the girl a couple of times whether anyone was home, but she replied that no one was and added that she was waiting on a bus to take her to day care. When they arrived at the unit, Ratliff saw through the exterior door that the interior door was open.

Ratliff opened the exterior door and yelled "hello." When no one answered, the girl walked inside and Ratliff followed her in. He continued to yell "hello" as he walked throughout the first floor of the house and then up the stairs. As Ratliff approached the top of the stairs, he finally heard someone say, "Hey, Boo." Ratliff responded, "Hello, where are you?" and a male voice replied that he was in the back room.

Ratliff and the girl walked into the room and found the man who would later be identified as Melvin Taylor. He was lying on a bed, looking like he had just been woken up. Ratliff asked Taylor whether he knew the girl, and Taylor replied that she was his daughter. When Ratliff explained where the girl had been found, Taylor became angry and said that she was suspended and was not supposed to catch the bus.

On a cabinet next to the bed, Ratliff noticed a plastic bag containing .22 caliber bullets. Taylor denied having a gun, but Ratliff remained understandably wary of leaving the girl with an angry man who kept a bag of bullets near his bed. Ratliff then requested identification, which Taylor denied having. Ratliff also asked Taylor if he knew his social security num-

ber or the address of the house in which he had been sleeping. Taylor could provide neither but did give a false name—Anthony Jackson—and a date of birth. Ratliff then called for backup to help verify the identity that Taylor had provided.

When Officer Boxley arrived in response to Ratliff's request, Ratliff pointed out the bag of bullets before going to Boxley's car to confirm the man's identity. Despite running the birth date provided with the name "Anthony Jackson" in several ways and in several databases, Ratliff found no matches. He returned to the house and repeatedly asked Taylor if he had any identification, but Taylor continued to deny that he did. In light of his lack of identification, the bag of bullets, and Ratliff's responsibility for the lost four-year-old girl, Ratliff asked Taylor to get up from the bed so that Ratliff could perform a protective sweep. The sweep revealed a handgun hidden under the mattress.

Ratliff did not, at that point, place Taylor under arrest. Due to the handgun and his lack of identification, however, Ratliff placed Taylor in handcuffs and had him sit in a chair next to the bed. Ratliff asked him again for identification and then for permission to look in the closet and desk for documents with his name on them, none of which were found. Then, while using Taylor's cell phone with his permission, Ratliff answered an incoming call from someone that caller ID identified as "baby's mama." The caller, who was Taylor's girlfriend and the four-year-old's mother, stated that the man's name was Orlando Taylor.

Taylor denied that was his name. When Ratliff ran the name in the police car, however, it eventually led to a photograph that matched the defendant and provided the alias Melvin Taylor. Ratliff also discovered that there were a pair of arrest warrants on file for Taylor. The officer verified that the warrants were valid and found that Taylor had felony convictions which made it illegal for him to possess the firearm.

Taylor's girlfriend arrived at the house while Ratliff was veri-fying Taylor's identity. After Ratliff read Taylor his *Miranda* rights, placed him under arrest, and verified that the woman was the girl's mother, Ratliff left the child with her.

On July 21, 2009, Taylor was charged as a felon in posses-sion of a firearm in violation of 18 U.S.C. § 922(g)(1) in the Eastern District of Virginia. He moved to suppress the gun and statements made at the time of arrest as the fruits of a warrantless search. The district court denied Taylor's motion on October 14, 2009, concluding that Ratliff's conduct was justified by exigent circumstances and the community care-taking doctrine. Shortly thereafter, Taylor pled guilty but reserved his right to appeal the suppression ruling. The district court sentenced Taylor to 46 months' imprisonment, and Tay-lor timely appealed.

## II.

Taylor's initial contention is that Officer Ratliff should have obtained a warrant before entering the house. This claim attempts to locate the officer's conduct within the rubric of the criminal justice system—a system in which police gener-ally search for evidence of a crime after the fact. The life-blood of this constitutional framework is the probable cause standard, and it is this standard that Taylor repeatedly asserts the officer should have met. *See Brief of Appellant* at 11, 16; *Appellant's Reply Brief* at 2-3.

Where police behavior falls outside the criminal justice rubric, however, warrants and the probable cause standard are inapposite. "[A] warrant is not required to establish the rea-sonableness of *all* government searches; and when a warrant is not required (and the Warrant Clause therefore not applica-ble), probable cause is not invariably required either." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995). In these situations, warrants based on probable cause would be an odd fit because "'[t]he standard of probable cause is

peculiarly related to criminal investigations.'" *United States v. Johnson*, 410 F.3d 137, 144 (4th Cir. 2005) (quoting *South Dakota v. Opperman*, 428 U.S. 364, 370 n.5 (1976)).

This case involved no criminal investigation. Officer Ratliff never received a report of a crime, nor did he have reason to suspect that a crime had taken or would take place. Far from seeking to arrest anyone, the officer merely worked to return a lost child to her caretaker. In practical terms, a warrant would make no sense here. The questions appropriate to a warrant application—probable cause of what crime? search of what premises? seizure of what items?—simply have no application in this case because the officer was responding to a noncriminal emergency. Taylor's insistence on a warrant amounts to an attempt to fit a square peg in a round hole.

A warrant would not only be an inappropriate solution to this problem, but possibly counterproductive as well. A detour to obtain a warrant would have delayed or frustrated the officer's pressing mission to safely reunite the young child with her parents or guardian. It is not clear, moreover, what the officer was to do with the child in the meantime. Leaving the girl where she was while securing a warrant would only prolong her exposure to mishap and danger. Just dropping her at home would not be much better, because the officer was not sure anyone was there to care for her. Leaving her with a neighbor begs the question of whether a neighbor was at home, or willing and able to assume responsibility. It was also not unreasonable for Officer Ratliff to decline to take the four-year-old girl to a stationhouse or a state agency under these circumstances. So while warrants are an invaluable tool for managing police discretion, the Constitution does not demand their use in every home emergency outside the criminal justice framework.

Taylor further insists that even if a warrant is not required, probable cause to believe that the house contained the object of Ratliff's search was still necessary. We find this contention

deficient for the same reasons just discussed—probable cause is a standard that is appropriate for matters of criminal investigation. *See Vernonia Sch. Dist. 47J*, 515 U.S. at 653; *Johnson*, 410 F.3d at 144. Although it is true that home entries involving exceptions to the warrant requirement frequently require probable cause, those cases are firmly situated within the criminal justice framework. In *United States v. Cephas*, 254 F.3d 488 (4th Cir. 2001), on which Taylor relies, an officer was investigating a tip that there were illegal drugs in an apartment when he entered to prevent destruction of the contraband. As this case lies outside of that investigative rubric, the probable cause standard remains properly foreign to an analysis of Officer Ratliff's conduct.

## III.

### A.

That a warrant was not necessary here does not mean that anything goes. Rather, we fall back on "the ultimate touchstone of the Fourth Amendment" which is reasonableness, measured objectively. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Taylor claims that the officer's entry to search for a parent or guardian also fails under this standard. We agree that not just any claimed justification will suffice to excuse a warrantless home entry, for "the right of a man to retreat into his own home and there be free from unreasonable government intrusion" is at "the very core" of Fourth Amendment protection. *Silverman v. United States*, 365 U.S. 505, 511 (1961).

Especially outside of criminal justice matters, however, there is an objective basis that makes police entry reasonable: the presence of exigent circumstances. An officer may enter the home if "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 394 (1978) (quotation omitted).

Then-Judge Burger described the driving force behind the exception for exigent circumstances: "[A] warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963).

In *Michigan v. Tyler*, 436 U.S. 499, 509 (1978), the Supreme Court applied the exigent circumstances doctrine and noted that "it would defy reason to suppose that firemen must secure a warrant or consent before entering a burning structure to put out the blaze." This court concluded in *United States v. Gwinn*, 219 F.3d 326 (4th Cir. 2000), that the exigency created by the risk of injury to a man arrested without shirt or shoes provided objectively reasonable grounds for a re-entry into his home to obtain clothing.

Most recently, in *Hunsberger v. Wood*, 570 F.3d 546 (4th Cir. 2009), we held that exigent circumstances justified the nighttime entry into a home reported by a neighbor to be unoccupied while its owners were on vacation. In addition to indicia of ongoing vandalism of the home and reports of recent arson in the neighborhood, there was evidence that a teenage girl whose parents could not locate her was inside the home and not answering her cell phone. *Id.* at 555. In those circumstances, there was an objective basis that made the warrantless entry reasonable. *Id.*

The circumstances surrounding this four-year-old girl's unsupervised odyssey constituted an emergency that made Officer Ratliff's actions no less reasonable. Simply as a general matter, "the absence of responsible adult supervision of children is an exigent circumstance justifying a warrantless entry." *People v. Peterson*, 543 S.E.2d 692, 696 (Ga. 2001). It is a truth too evident to be told that children learn to move about long before they learn to exercise good judgment. That

this small child was wandering alone along a busy street made matters even more pressing. It is undisputed that the street was a thoroughfare, commonly used by drivers as an alternate route to avoid traffic lights, with significant traffic throughout the day.

Few places could be less appropriate for an unattended child. Abduction and a collision with a vehicle on the heavily traveled road are but two of the most obvious perils that she faced. If, as the Ninth Circuit has concluded, "[t]he possibility of a nine-year-old child in a house in the middle of the night without the supervision of any responsible adult is a situation requiring immediate police assistance," *see United States v. Bradley*, 321 F.3d 1212, 1215 (9th Cir. 2003), then the officer's assistance was warranted here, where a much younger child was not even in the safety of a house. The danger that abandonment posed to this young girl's welfare made clear that the officer's entry to find her parents or guardian or caretaker was a reasonable one.

Nor was the exigency strictly limited to the girl herself, for a child of such tender age wandering alone outside the home raised the real possibility that her caretaker was unconscious or otherwise in need of assistance. The district court noted this point in particular, that "[u]nder no circumstances should a four-year-old child be left alone at home, so the officer knew that there should be someone at home with the child." JA 113. When yelling from the doorway produced no response, a reasonable officer could have concluded that someone inside may well have needed help. Although the girl did state that no one was home, her youth and time spent wandering away from the house that morning called the basis of her knowledge for that pronouncement into question. Under the circumstances, the district court was right to conclude that there was "an objectively reasonable belief that something might be awry" within the home, and that Officer Ratliff did the reasonable thing by following the child inside in an effort to render assistance and to ensure the child's safety. JA 113.

The reasonable belief that prompt assistance was needed distinguishes this case from *United States v. Moss*, 963 F.2d 673 (4th Cir. 1992), where we held that a forest service officer's warrantless entry into a cabin thought to be illegally occupied was unreasonable. In that case, where the officer suspected a crime had taken place, there simply was no basis at all to support "any objectively reasonable perception of an emergency that required immediate identification of the occupants in order to give them assistance—or indeed that assistance was needed." *Id.* at 679. Here, by contrast, both the self-evident danger that the abandoned child posed to herself and the inference of danger to her caretaker made it reasonable to conclude that it was necessary to make a brief entry to find someone inside the home—and to do so promptly.

B.

That Officer Ratliff's initial entry was reasonable does not exhaust the concerns of the Fourth Amendment. Rather, the scope of the ensuing search must also be reasonable. Indeed, "[a]ny search following warrantless entry for emergency reasons . . . must then be limited by the type of emergency involved. It cannot be used as the occasion for a general voyage of discovery unrelated to the purpose of the entry." *United States v. Moss*, 963 F.2d 673, 678 (4th Cir. 1992) (citation omitted).

Under these circumstances, Officer Ratliff's conduct did not transgress constitutional boundaries. He made no effort to search. He looked at no papers or personal effects; he scrutinized no areas that could not contain an adult who needed assistance or could care for the child. Rather, Ratliff simply yelled "hello"—an innocuous query offered solely in the benign hope of finding a parent or guardian. As the district court noted, "If a responsible adult had responded to Ratliff's initial calls of 'hello' and had provided identification demonstrating that he or she was the child's parent or guardian, that would have been the end of it. Indeed, when [the child's

mother] arrived and Ratliff was able to determine that she was the child's mother, he left the child with her." JA 112. The entry was thus "'strictly circumscribed'" by the exigency that led to it. *See Gwinn*, 219 F.3d at 332 (quoting *Mincey v. Arizona*, 437 U.S. 385, 393 (1978)).

It is true that when Ratliff and the child happened upon Taylor upstairs, he did not need assistance and Ratliff did not leave the child with him. However, the officer did not act unreasonably by heeding the signs counseling caution before leaving the girl with Taylor. First of all, Taylor had no identification or other means of proving that he was in fact the girl's father. Secondly, he could not recite the address of the house he had been sleeping in. This would be a curious lapse of memory in a person whose child actually lived in the house. Finally, the transparent bag of bullets in plain view near the bed and Taylor's visible anger with the child would have left any temporary guardian of her ill at ease. When Officer Ratliff verified that the identity Taylor had provided was patently false, the protective sweep that revealed the gun under the mattress was justified not only for the officer's own safety but for that of the child as well. Finally, as the district court noted, the protective search was limited to "the area from within which the defendant might gain possession of a weapon." JA 114. Only upon "Ratliff's determination of the defendant's true identity" was the defendant "arrested and charged with felon in possession of a firearm and for providing false information to police." *Id.*

We find nothing unreasonable in this chain of events. "An effort to return a small child to its home after it has been found locked out, lonely and unattended is not unreasonable. Further, . . . it is not unreasonable to determine if the child may be safely left at its home." *In re Dawn O.*, 128 Cal. Rptr. 852, 854 (Cal. Ct. App. 1976). The Supreme Court has recognized that "customary social usage" will have a "substantial bearing on Fourth Amendment reasonableness in specific circumstances," *Georgia v. Randolph*, 547 U.S. 103, 121 (2006),

and we find it difficult to believe that the officer's solicitude for the interests of both parents and children here would violate customary social understanding in any sense. As Justice Holmes remarked long ago, law does not lightly place itself at odds with "the general habits of the community," at least where the relevant standard is one of reasonableness. *Hawkes v. Locke*, 1 N.E. 543, 544 (Mass. 1885).

IV.

So what else in the final analysis should the officer have done? Taylor insists that Officer Ratliff's entry was unreasonable because there were less intrusive options available. We find this contention curious. Not only does Taylor fail to offer any superior alternatives, but the inferiority of Taylor's suggested options reinforces the reasonableness of what Officer Ratliff actually did. Taylor submits in his brief that the officer would have done better by "leaving a note on the front door while taking the child to safety." *Brief of Appellant* at 30. Where, then, was she to be taken? Taylor's brief offers not a clue. And no wonder—an officer can hardly be expected to serve as an indefinite babysitter, and a police station is hardly a proper daycare facility for a four-year-old child.

At oral argument, Taylor also proposed that Officer Ratliff should have undertaken an intensive fact-finding mission. In Taylor's view, the proper thing to do was to question the child in detail, then to take the girl around to "talk to neighbors [and] ask questions," and to "keep asking questions and looking for evidence that would actually support a reasonable belief that someone was inside the home."

This proposal has several drawbacks. First, it assumes that this four-year-old child had more relevant data to contribute. It also assumes without basis that any neighbors who had information about the child's family or daycare plans would have been home at that mid-day hour. Finally, officers confronting potential emergencies such as this one "need [to

make] an on-the-spot judgment based on incomplete information and sometimes ambiguous facts bearing upon the potential for serious consequences." *United States v. Martins*, 413 F.3d 139, 147 (1st Cir. 2005). The officer did just that, and we will not engage in "should have/could have/would have" hindsight to undercut his objectively reasonable belief that the best way to speedily reunite parent and child was to do precisely what he did.

Even if Taylor could point to an unproblematic alternative, it would offer no support to his contention that Officer Ratliff behaved unreasonably. The Supreme Court has made clear that reasonableness analysis "does not require employing the least intrusive means, because the logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers." *Safford Unified Sch. Dist. #1 v. Redding*, 129 S. Ct. 2633, 2652 n.4 (2009) (quoting *Bd. of Educ. v. Earls*, 536 U.S. 822, 837 (2002)); *see also Hunsberger*, 570 F.3d at 556 ("[T]he fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the search unreasonable.") (quoting *Cady v. Dombrowski*, 413 U.S. 433, 447 (1973)). The officer's behavior was reasonably calculated to reunite his young charge with her family; to require more would threaten the safe and speedy return of other lost children.*

V.

We recognize that any intrusion into the home, whether for criminal investigation or for more benign purposes, poses a threat to that privacy we hold most dear. For that reason, war-

---

*Because we conclude that exigent circumstances rendered Officer Ratliff's conduct objectively reasonable, we need not address the question of whether the entry was also permissible under the community caretaking doctrine. It suffices to say that the officer responded reasonably to an emergency, and therefore the Fourth Amendment was not violated.

rantless entries outside of the criminal justice rubric must be scrutinized carefully under the standard of objective reasonableness. In this case, the district court did just that and arrived at a practical and commonsense application of the law. The implications of reversing that court might not only redound to the detriment of small children but amount to a constitutional proclamation that no good deed goes unpunished and that law enforcement cannot act to prevent harm or to serve an undisputed public good. The officer acted with caution in the legitimate belief that protection of the most vulnerable members of our society would not become a constitutional infraction. The restrictions urged by appellant would not be in the interests of small children, would not be in the interests of their parents, and would not be in the interests of the community. We shall accordingly affirm the district court.

*AFFIRMED*