PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

   *Plaintiff-Appellant,*

v.

JORDAN LAUDERMILT,

   *Defendant-Appellee.*

No. 11-4624

Appeal from the United States District Court
for the Northern District of West Virginia, at Wheeling.
Frederick P. Stamp, Jr., Senior District Judge.
(5:11-cr-00010-FPS-JES-1)

Argued: March 22, 2012

Decided: May 3, 2012

Before SHEDD, KEENAN, and FLOYD, Circuit Judges.

Reversed and remanded by published opinion. Judge Shedd
wrote the opinion, in which Judge Keenan and Judge Floyd
joined.

## COUNSEL

**ARGUED:** William J. Ihlenfeld, II, OFFICE OF THE
UNITED STATES ATTORNEY, Wheeling, West Virginia,
for Appellant. Brendan S. Leary, OFFICE OF THE FED-
ERAL PUBLIC DEFENDER, Wheeling, West Virginia, for

Appellee. **ON BRIEF:** Randolph J. Bernard, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellant. Kristen M. Leddy, Research and Writing Specialist, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Martinsburg, West Virginia, for Appellee.

---

**OPINION**

SHEDD, Circuit Judge:

A federal grand jury indicted Jordan Laudermilt on one count of possession of a firearm after a felony conviction, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a). Laudermilt moved before trial to suppress the firearm, arguing that the police seized it in violation of the Fourth Amendment. The district court agreed, and the Government noted a timely appeal under 18 U.S.C. § 3731. Because the police officers' actions in this case complied with the Fourth Amendment, we reverse.

I.

On the rainy evening of February 27, 2011, at around 10 p.m., Shannalee Kuri placed a 911 call to report that Laudermilt, who was her boyfriend, was threatening her and her family with a gun at his home in Wheeling, West Virginia.[1] The Ohio County Sheriff's Department responded by sending five officers to the scene—Deputies Brooks, Costello, Moore, and Bise, and Sergeant Ernest. Because the residence was located close to the campus of West Liberty University, an officer from that Department, Sergeant Olejasz, also responded. The officers were familiar with the residence because of past domestic disputes involving its occupants.

---

[1]Just prior to this call, Kuri's sister-in-law had placed three 911 calls relaying the same events.

The officers arrived at Laudermilt's property in staggered succession and approached the house, which was located at the end of a lane atop a hill. Shortly after arriving at the property, Sergeant Olejasz and Deputy Costello initiated a traffic stop of a vehicle leaving the residence because they noticed there was an individual "slouched" down in the passenger seat. (J.A. 154). After confirming that Laudermilt was not the passenger, the officers permitted the car to leave and continued up the hill. Outside the house, the officers encountered Kuri, her brother, and her father. Kuri and her father informed the officers that Laudermilt was inside the house with a gun. After the officers' arrival, Laudermilt—unaware of the officers' presence—intermittently exited the house onto the front porch to threaten Kuri and her family, shouting he would "kill" her and that he was going to "f**k them up." (J.A. 91). Although the officers never witnessed Laudermilt with a gun, on one occasion he exited the house, knelt down out of view, picked something up, and returned inside. The officers determined the best course of action was to seize Laudermilt the next time he exited the house without a firearm. When Laudermilt did so, the officers quickly moved in and took him into custody.

At that point, Deputies Costello, Brooks, and Moore, along with Sergeant Ernest, entered the residence to perform a protective sweep. Laudermilt shouted to Deputy Bise and Sergeant Olejasz—who were securing his arrest—that his 14-year-old brother, J. Lee Pritt, was in the house. Laudermilt also informed them that Pritt was autistic. The four officers performed a protective sweep of the upstairs of the house, with Deputy Costello and Deputy Moore covering the bedrooms on the right side of the house, and Deputy Brooks and Sergeant Ernest sweeping the bedrooms to the left. In performing the sweep, Deputy Costello quickly found Pritt, who was "shaking" and talking on the phone with his mother, informing her of the police presence. (J.A. 128). Deputy Costello escorted Pritt downstairs, attempting to calm him. Costello initially walked Pritt outside but then returned him inside

to the kitchen. By this time, Deputy Bise had entered the house and was sitting in the kitchen. As Pritt came into the kitchen and sat down, Deputy Bise asked him if he knew where the gun was. Pritt, who had been "freaking out" and "panicking," stood up and walked to a pantry off the kitchen and pointed to a rifle sitting in plain view on a gun rack. (J.A. 116). While Deputy Bise secured the rifle, Deputy Brooks and Sergeant Ernest continued to complete their sweep. The total sweep, from start to finish, lasted about five minutes.

At the time the officers conducted the search, there was conflicting information regarding how many occupants might be in the house. Deputy Brooks testified that, pursuant to the radio call he received, he believed Laudermilt and two other males were in the house, and that when he began the sweep, he believed two subjects might still be in the home. (J.A. 77, 83). Deputy Costello testified that Laudermilt told him another person was inside, and that Deputy Bise later called out that Laudermilt's autistic brother was in the home. (J.A. 134-35). Deputies Moore and Bise testified that they believed only Pritt was inside, and Sergeant Ernest testified that the information about the number of occupants was unclear. As noted above, two individuals left the property as the officers arrived and Kuri and her family were also on the premises.

Based on the foregoing, a grand jury indicted Laudermilt for violating §§ 922(g)(1) and 924(a). Laudermilt moved to suppress the firearm, and, following an evidentiary hearing, the magistrate judge recommended granting the motion. The magistrate judge concluded that a protective sweep of the home was authorized but that the "exigent circumstances" ended by the time the firearm was seized because "the residence had been secured." (J.A. 178). The judge explained, "[a]fter the protective sweep, the police officers had all individuals in the home that night either in police custody or under police control thereby negating any exigent circumstances argument." (J.A. 178).

After the Government filed objections to the magistrate judge's report, the district court adopted the report and granted the motion to suppress. The district court concluded that a protective sweep was authorized under *Maryland v. Buie*, 494 U.S. 325 (1990), but that *Buie* did not permit officers "to seize the firearm after the residence had been secured and the protective sweep had ended." (J.A. 213). In the district court's view, because Laudermilt told Deputy Bise that only his brother was in the house, "Deputy Bise was aware that the house was secure when Pritt was brought downstairs to the kitchen," and that "[f]rom the perspective of Deputy Bise, a suspicion of danger could not have existed" after that point. (J.A. 214). The district court noted that the sweep itself was still ongoing while Bise spoke to Pritt in the kitchen and recovered the gun, but found that fact irrelevant because "it is Deputy Bise's knowledge that is key." (J.A. 214). The court recognized that the case "present[s] a situation in which conscientious law enforcement officers are working under potentially dangerous conditions and circumstances requiring action over a short period of time," but nonetheless concluded that the firearm's seizure violated the Fourth Amendment. (J.A. 215).

## II.

In reviewing the grant of a suppression motion, we review the court's factual findings for clear error and its legal determinations de novo. *United States v. Lewis*, 606 F.3d 193, 197 (4th Cir. 2010). In performing our review, "we must construe the evidence in the light most favorable to the prevailing party, and give due weight to inferences drawn from those facts by resident judges and law enforcement officers." *Id.* (internal quotation marks omitted).

## A.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects,

against unreasonable searches and seizures." U.S. Const. amend. IV. "It is a 'basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)). Nonetheless, this "presumption may be overcome in some circumstances because the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Kentucky v. King*, 131 S.Ct. 1849, 1856 (2011) (internal quotation marks and alteration omitted).

One "well-settled" exception to the warrant requirement is a "protective sweep" under *Buie*. *United States v. Jones*, 667 F.3d 477, 482 (4th Cir. 2012). When police officers make an arrest at a home, they are entitled to perform a further "protective sweep" of the house when they have "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334. "This standard is an extension of the doctrine that permits a police officer to pat down an individual for concealed weapons upon a reasonable suspicion that the individual might be armed, provided that the officer's belief is grounded in 'specific and articulable facts.'" *United States v. Martins*, 413 F.3d 139, 149 (1st Cir. 2005) (quoting *Buie*, 494 U.S. at 331-32 (internal quotation marks omitted)).

A protective sweep is limited to "a cursory inspection of those spaces where a person may be found" and should last "no longer than it takes to complete the arrest and depart the premises." *Buie*, 494 U.S. at 335–36. We have distilled this language to indicate that "the sweep may last no longer than needed 'to dispel the reasonable suspicion of danger' and no longer than needed to arrest the suspect and leave the premises." *United States v. Green*, 599 F.3d 360, 376 (4th Cir. 2010) (quoting *Buie*, 494 U.S. at 335-36). We recently noted that the "linchpin of the protective sweep analysis is not 'the

threat posed by the arrestee, [but] the safety threat posed by the house, or more properly by unseen third parties in the house.'" *Jones*, 667 F.3d at 484 (quoting *Buie*, 494 U.S. at 336). *Cf. Mora v. City of Gaithersburg*, 519 F.3d 216, 226 (4th Cir. 2008) (upholding a preventive search when officers "did not and could not fully know the dimensions of the threat they faced").

Applying this framework, we believe the district court erred in granting the suppression motion. We begin by noting our agreement with the district court that the protective sweep was justified by *Buie*. The officers were responding to a potentially volatile situation involving a firearm and a domestic dispute, and they personally witnessed Laudermilt threatening Kuri and her family. When the officers arrested Laudermilt, the firearm was unaccounted for and—even by Laudermilt's own admission—at least one other person was in the home. In addition, as the officers were arriving on the scene, two individuals were leaving in a vehicle, one of whom was "slouched" over in his seat. Clearly, these articulable facts would have led a reasonably prudent officer to believe a protective sweep was warranted.[2]

We disagree, however, with the district court's conclusion that the sweep necessarily ended the very moment Pritt was secured. The officers' testimony before the district court indicates a level of confusion regarding how many people were in the house that evening. Deputy Brooks, one of the two officers who continued sweeping the house after Deputy Costello secured Pritt, testified that his radio call indicated two other adult males were on the premises; likewise, Sergeant Ernest indicated that when he arrived he was unsure how many people might be on the property. This confusion is indicative of the escalating situation the officers faced—four 911 calls placed in quick succession regarding a potentially violent

---

[2]The fact that Laudermilt was arrested outside the home does not affect the protective sweep analysis. *See Jones*, 667 F.3d at 485 n.10.

domestic confrontation. In addition to this confusion, testimony established that at least two other individuals were in the premises when the officers arrived—Sergeant Olejasz and Deputy Costello initiated a traffic stop of a vehicle leaving the premises.

The district court placed undue importance on Laudermilt's decision to inform the officers that only his special needs brother was in the house. While this admission serves as an articulable fact justifying the protective sweep, *see United States v. Cavely*, 318 F.3d 987, 996 (10th Cir. 2003) (noting protective sweep justified, in part, because homeowner arrested outside house informed officers a "friend" was inside), officers are not bound by a suspect's statement. *See Solis-Alarcon v. United States*, 662 F.3d 577, 582 (1st Cir. 2011) (noting, in upholding protective sweep for arrest suspect, that "[t]he officers were not required to accept plaintiffs' word that [the suspect] was absent"). At the time the officers seized Laudermilt, they reasonably believed at least one other person and a firearm were inside the house. Under such circumstances, we do not believe the sweep had to cease the moment Pritt was secured.

As we have previously explained, "[w]e are to approach the Fourth Amendment . . . with at least some measure of pragmatism. If there is a grave public need for the police to take preventive action, the Constitution may impose limits, but it will not bar the way." *Mora*, 519 F.3d at 222. The district court's ruling failed to "recognize that unaccounted-for third parties with access to firearms may present a grave danger to arresting officers." *Fishbein ex rel. Fishbein v. City Of Glenwood Springs, Colorado*, 469 F.3d 957, 962 (10th Cir. 2006). That grave danger permitted the officers to conclude the sweep of the entire house. In addition, the entire sweep lasted about five minutes; this was not a situation where the officers secured a third-party and used that as a justification for a broad-reaching or lengthy additional search. *See*, *e.g.*, *id.* at 961-62 (upholding sweep with duration of five minutes);

*United States v. Burrows*, 48 F.3d 1011, 1017 (7th Cir. 1995) (same); *United States v. Delgado*, 903 F.2d 1495, 1501-02 (11th Cir. 1990) (same).

Laudermilt relies on a recent line of our cases, epitomized by *United States v. Foster*, 634 F.3d 243 (4th Cir. 2011), for the principle that this court will not accept "post hoc rationalizations to validate those seizures that happen to turn up contraband." *Id.* at 249. *See also United States v. Powell*, ___ F.3d ___, 2011 WL 5517347, at *1 (4th Cir. 2011) (noting for fourth time in 2011 "we once again are presented with a case in which the Government has attempted to meet its burden under *Terry[ v. Ohio*, 392 U.S. 1 (1968)], by cobbling together a set of facts that falls far short of establishing reasonable suspicion."). In *Foster*, we further noted "our concern about the inclination of the Government toward using whatever facts are present, no matter how innocent, as indicia of suspicious activity." *Id.* at 248.

In Laudermilt's view, the Government is engaging in the same post hoc rationalizations in this case to create an emergent situation from rather innocuous facts. We disagree; a prominent difference between *Foster* and this case is that *Foster* addressed the police's ability to stop and frisk under *Terry*. The issue in those cases was the Government's use of "innocent" facts to justify suspicion. In this case, the officers were responding to multiple 911 calls involving domestic threats and a firearm and, in fact, bore witness to Laudermilt's threatening behavior. There is clear, objective evidence of an emergent situation involving domestic violence and a firearm, and the sweep was born of that situation. This is not a case like *Foster* in which a search "happened" to turn up contraband. The officers had specific witness statements that Laudermilt possessed a firearm and was using it to threaten Kuri.

B.

Moreover, even assuming the sweep should have termi-nated after Pritt was secured, we believe the seizure of the firearm was still permissible. The protective sweep was con-ducted on a rainy February night. A 14-year-old special needs child, self-described as "freaking out" and "scared," was in the house. (J.A. 116). We have previously noted that it is an offi-cer's "duty to look after the reasonable safety requirements of persons in their custody." *United States v. Gwinn*, 219 F.3d 326, 333 (4th Cir. 2000). It was thus reasonable for the offi-cers to permit him to stay in familiar surroundings until his mother arrived home.[3]

Once the officers permitted Pritt to stay in the house, it was not unreasonable for them to ask him about the firearm, because "'it is not unreasonable to determine if the child may be safely left at its home.'" *United States v. Taylor*, 624 F.3d 626, 633 (4th Cir. 2011) (quoting *In re Dawn O*, 128 Cal.Rptr. 852, 854 (Cal. Ct. App. 1976)). *Taylor* illustrates this point.

In *Taylor*, a police officer was attempting to reunite a four-year old girl with her parents after she was found walking alone on the street. After the girl identified her home, the offi-cer knocked on the door and eventually entered, calling out "hello." *Id.* at 629. A male voice then responded from an upstairs bedroom, and the officer walked with the girl to the room. Upon entering, the officer noted a plastic bag with bul-lets; the officer also noted that the man became angry when told that the girl was wandering the streets. Eventually, after the man refused to provide identification or evidence that he

---

[3]Laudermilt contends that, once Deputy Costello briefly walked Pritt outside, the scene was secure and Pritt should have remained outside until his mother arrived several minutes later. Here, it is Laudermilt applying post hoc rationalizations. The officers had no way of knowing when Pritt's mother would arrive and were under no requirement to keep a scared spe-cial needs child outside on a rainy night in the hopes that she would be home soon. Likewise, the officers would have been derelict in their duty to simply send Pritt back into the house by himself.

resided at the house, the officer conducted a quick protective search of the room, uncovering a handgun under the bed. In upholding the search, we explained:

> The Supreme Court has recognized that "customary social usage" will have a "substantial bearing on Fourth Amendment reasonableness in specific circumstances," *Georgia v. Randolph*, 547 U.S. 103, 121 (2006), and we find it difficult to believe that the officer's solicitude for the interests of both parents and children here would violate customary social understanding in any sense.

*Id.* at 633-34. In this case, the officers' decision to inquire about the location of the firearm in order to make sure the home was safe was not unreasonable. As in *Taylor*, "we find it difficult to believe that the officer's solicitude" for Pritt's interests "would violate customary social understanding in any sense." *Id.* at 634.[4]

### III.

In sum, the police officers' actions in this case are consistent with the Fourth Amendment. In a threatening domestic situation, with information that at least a special needs child was in the home, they conducted a properly circumscribed protective sweep, which yielded the discovery of a firearm as that sweep continued. Accordingly, the district court's order granting Laudermilt's suppression motion is reversed, and this case is remanded for further proceedings.

*REVERSED AND REMANDED*

---

[4]Laudermilt suggested at oral argument that the officers had other options in dealing with Pritt. However, even if that assumption is true, "the fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the search unreasonable." *Hunsberger v. Wood*, 570 F.3d 546, 556 (4th Cir. 2009) (internal quotation marks omitted).