**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

REBECCA LISA JONES, a/k/a Rebecca North,

*Defendant-Appellant.*

No. 10-4442

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

KIPLING JOE JONES, a/k/a Kip Jones,

*Defendant-Appellant.*

No. 10-4698

Appeals from the United States District Court
for the Western District of North Carolina, at Bryson City.
Martin K. Reidinger, District Judge;
Lacy H. Thornburg, District Judge.
(2:09-cr-00011-MR-2, 2:09-cr-00011-MR-1)

Argued: December 6, 2011

Decided: January 13, 2012

Before KING and DIAZ, Circuit Judges, and
Richard M. GERGEL, United States District Judge for the
District of South Carolina, sitting by designation.

Affirmed in part, vacated in part, and remanded by published opinion. Judge King wrote the opinion, in which Judge Diaz and Judge Gergel joined.

---

**COUNSEL**

**ARGUED:** Matthew Segal, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Asheville, North Carolina, for Appellants. Richard Lee Edwards, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee. **ON BRIEF:** Claire J. Rauscher, Executive Director, Fredilyn Sison, Assistant Federal Defender, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Asheville, North Carolina, for Appellant Rebecca Lisa Jones; Robert W. Waddell, THE WADDELL LAW FIRM, PLLC, Greenville, North Carolina, for Appellant Kipling Joe Jones. Anne M. Tompkins, United States Attorney, Charlotte, North Carolina, for Appellee.

---

**OPINION**

KING, Circuit Judge:

Defendants Kipling J. Jones and Rebecca L. Jones, husband and wife, appeal their convictions in the Western District of North Carolina for conspiracy to manufacture, distribute, and dispense, and to possess with intent to distribute and dispense, methamphetamine ("meth"), in contravention of 21 U.S.C. § 846. The Joneses' drug conspiracy convictions were predicated on conditional guilty pleas, pursuant to which they preserved their rights to appeal the district court's denial of motions to suppress. *See United States v. Jones*, No. 2:09-cr-00011 (W.D.N.C. July 29, 2009) (the "Order").[1] Kipling Jones

---

[1]The Order is found at J.A. 150-61. (Citations herein to "J.A.___" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

also appeals from his sentence of 262 months in prison. As explained below, we affirm the court's denial of the suppression motions, but vacate Mr. Jones's sentence and remand.

I.

A.

On the evening of October 28, 2008, the Cherokee County, North Carolina Sheriff's Office received a call from Mike Monteith, a narcotics officer with the Polk County, Tennessee Sheriff's Office.[2] Monteith advised that an officer from the Bradley County, Tennessee Sheriff's Office had notified him that an individual had been admitted to a hospital in Bradley County with serious burn injuries believed to have been sustained in a meth lab explosion. Monteith investigated the incident by visiting the burn victim's house and speaking with the victim's son, who advised that his father had been "at Kip and Becky's house" earlier that day. *See* Order 3. During Monteith's visit, the victim's son received a telephone call, which the caller ID indicated was from the Joneses' home phone.

Based on information relayed by Monteith, four officers of the Cherokee County Sheriff's Office were dispatched to the Jones residence in Murphy, North Carolina. When the officers arrived at the Jones residence around 1:00 on the morning of October 29, 2008, they observed seven motor vehicles on the property, including a "camper," a truck, and an "SUV." *See* J.A. 61-62. As they approached, the officers did not observe any disturbances or signs of activity within the house, which was dark except for some light apparently emanating from a television set in the living room. In response to the officers' knock at the front door, the Joneses opened the door after a few moments and met the officers on the front porch. The officers explained that they were investigating a burn victim's

---

[2]Our recitation of the facts concerning the suppression issue tracks the Order's factual findings, which are largely undisputed.

injuries and a possible meth lab explosion. Kipling Jones informed the four officers that he did not know anything about a burn victim or a meth lab explosion and asked the officers to leave his property.

The officers started to comply but, as they were about to leave the driveway, Officer Sean Matthews recalled that Kipling Jones might be the subject of an outstanding arrest warrant. One of the officers then confirmed by radio that there was an arrest warrant for Mr. Jones and a corresponding request for extradition from the State of Georgia. The officers promptly returned to the Jones residence to arrest Mr. Jones. On this occasion, the officers found Mr. Jones in the open doorway of the residence, informed him of the outstanding warrant, and placed him under arrest. Although Mr. Jones protested that he had already been arrested on that warrant, he did not resist. During the arrest, Rebecca Jones raised her voice to question her husband's arrest, but did not either impede the arrest or otherwise cause difficulty for the officers.

As Officer Matthews was placing Kipling Jones in handcuffs, the other officers entered the house through the front door with their handguns drawn. Officer Dustin Smith promptly informed the Joneses that the officers were going to conduct a protective sweep of the residence, explaining that this was being done for the officers' safety. The officers asked the Joneses if there was anyone else in the house, and they replied that there was not. From his vantage point on the front porch, Officer Smith did not see any indication of illegal drug activity, and he did not hear or see any movement from within the house to indicate the presence of other persons. Smith was nevertheless suspicious that others might be in the house, based primarily on his prior dealings with the Joneses, whom he had investigated at various times since 2003 as part of his duties as a narcotics officer.[3]

---

[3]The Jones residence had been previously under surveillance. Prior to the events giving rise to this case, Officer Smith's surveillance had

During the officers' protective sweep, the Joneses were in the living room of the house. From the front door, the officers walked through the living room and the adjoining kitchen, and quickly scanned the remaining rooms but did not find anyone else in the house. Although there was a closed door leading to the basement, Officer Smith did not open it because there was a cloth along the door's bottom, possibly used to retain heat, and Smith did not believe that anyone had been through the basement doorway. Smith and the other officers noticed a number of items in plain view during their sweep. Based on his training and experience in narcotics investigations, Officer Smith believed that several of these items constituted precursor materials for the manufacture of meth. Smith also detected a strong odor that he associated with meth production. In the living room, Smith observed a pipe containing marijuana and a pill that had been crushed into powder, lying on an end table beside the couch where Rebecca Jones had been sitting.

Mrs. Jones was also then placed under arrest for possession of marijuana, and both Joneses were transported to the Cherokee County Sheriff's Office. An officer remained at the Jones residence to secure the house until the other officers could obtain a search warrant. That afternoon, Officer Smith applied for and obtained a search warrant from the Superior Court of

revealed that known drug users frequented the Jones residence, among them a man named Andrew Morrow. Smith had arrested Morrow in the past for controlled substance violations and had seized firearms from him. During a prior surveillance, Smith had stopped Morrow, after observing him entering and leaving the Jones residence, and Morrow had disclosed that at least two other persons, Cleaston Dockery and Marshall Cornett, had purchased meth from the Joneses. Smith had also previously arrested Dockery and observed him under the influence of meth, exhibiting loud behavior and acting irrationally. Cornett had also been arrested by Smith, once as Cornett left the Jones residence, on a possession of meth charge. In addition to the Joneses' known drug clientele, Smith knew from a confidential informant that a fugitive from Georgia, Craig Wolford, had been at the Jones residence. Smith further understood that Wolford had fled from the authorities after a meth lab had been discovered at his Georgia residence.

Cherokee County. Smith's application for the warrant specifies that he and Officer Matt Kuhn had "conducted a safety search of the [Jones] residence for other persons" and detailed the items they had observed in plain view. Later that day, the North Carolina State Bureau of Investigation executed the search warrant, seizing, inter alia, a meth mixture and drug paraphernalia.

B.

On June 3, 2009, the grand jury in the Western District of North Carolina returned the operative indictment in this case, charging the Joneses with four offenses arising from the evidence seized at their residence. Most pertinent here, Count One charged the Joneses with conspiracy to manufacture, distribute, and dispense, and to possess with intent to distribute and dispense, at least 400 grams of a mixture and substance containing a detectable amount of methamphetamine, in contravention of 21 U.S.C. § 846. On June 5, 2009, Rebecca Jones filed a motion to suppress the evidence seized from the Jones residence on the ground that the warrantless protective sweep that led to the discovery of evidence in plain view — and provided probable cause for the search warrant — violated her Fourth Amendment rights. On July 12, 2009, Kipling Jones filed a nearly identical motion to suppress on the same basis.[4] The district court conducted a hearing on the suppression motions on July 24, 2009, during which it received the testimony of Officer Smith and heard argument of counsel.

Promptly thereafter, on July 29, 2009, the district court entered the Order reflecting the rulings at issue here, denying both motions to suppress. In so ruling, the court concluded that the officers' protective sweep of the Jones residence was constitutionally permissible under the Supreme Court's deci-

---

[4]In both the district court and on appeal, the Joneses have been represented by separate counsel.

sion in *Maryland v. Buie*, 494 U.S. 325 (1990) (upholding limited protective sweep of residence incident to arrest where officers reasonably suspect that area may harbor dangerous individuals).

Subsequently, the Joneses entered their conditional guilty pleas to Count One — reserving their rights to appeal the district court's denial of their suppression motions. The government agreed to dismiss the other three counts of the indictment, and the probation officer prepared and submitted presentence investigation reports (the "PSRs") for the Joneses. Kipling Jones's PSR recommended a career offender sentencing enhancement under section 4B1.1 of the Sentencing Guidelines.[5] One of the two convictions underlying the PSR's career offender enhancement was Mr. Jones's May 2005 conviction in North Carolina on a charge of "Possession With Intent to Manufacture/Sell/Deliver a Controlled Substance" and "Possession of a Precursor Chemical With Intent to Manufacture." *See* J.A. 395. Mr. Jones had pleaded guilty to that charge and received six to eight months in prison, suspended, plus thirty-six months of supervised probation. Mr. Jones objected to the PSR's recommendation of a career offender enhancement. Each defendant also filed objections to the drug amount recommended by the PSRs.

Rebecca Jones's sentencing hearing was conducted on

---

[5]At the time of Mr. Jones's sentencing, the Guidelines provided:

> (a) A defendant is a career offender if (1) [he] was at least eighteen years old at the time [he] committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) [he] has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

USSG § 4B1.1(a) (2008). For purposes of the career offender provision, a "prior felony conviction" included "a prior . . . state conviction for an offense punishable by . . . imprisonment for a term exceeding one year." *Id.* § 4B1.2 cmt. n.1.

March 31, 2010. After sustaining her objection to the drug amount recommended, the district court imposed a sixty-month sentence. Judgment was entered on April 8, 2010, and Mrs. Jones has timely appealed her conviction. On June 16, 2010, the court concluded Kipling Jones's sentencing hearing, sustained his objection on the drug amount recommended, overruled his other objections, and imposed a sentence of 262 months. Mr. Jones has timely appealed his conviction and sentence. We possess jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).[6]

Prior to oral argument in these appeals, the government conceded that Kipling Jones's sentence is procedurally unreasonable and should be vacated and remanded, in light of our recent decision in *United States v. Simmons*, 649 F.3d 237 (4th Cir. 2011) (en banc). The government thereby elected not to seek enforcement of the waiver of appellate rights contained in its plea agreement with Mr. Jones.

II.

In assessing a district court's decision on a suppression issue, we review the court's factual findings for clear error and its legal determinations de novo. *See United States v. Lewis*, 606 F.3d 193, 197 (4th Cir. 2010). In undertaking this review, "we must construe the evidence in the light most favorable to the prevailing party, and give due weight to inferences drawn from those facts by resident judges and law enforcement officers." *Id.* (citation and internal quotation marks omitted). We review de novo a question concerning whether a prior state conviction qualifies as a prior felony conviction under the career offender provision. *See United States v. Smith*, 359 F.3d 662, 664 (4th Cir. 2004).

---

[6]The Joneses' appeals (Nos. 10-4442 and 10-4698) were consolidated for further proceedings in this Court on July 30, 2010.

### III.

The Joneses maintain on appeal that the protective sweep of their residence was unconstitutional because the authorities did not possess a sufficient factual basis for a reasonable suspicion that there were other individuals in their residence who could pose a danger to the officers in connection with their arrest of Kipling Jones. Separately, Mr. Jones agrees with the government that his sentence is procedurally unreasonable, in reliance on our decision in *United States v. Simmons*, 649 F.3d 237 (4th Cir. 2011) (en banc). We consider each contention in turn.

### A.

### 1.

The Fourth Amendment of the Constitution of the United States protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. As the Supreme Court has recognized, the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (internal quotation marks omitted). Thus, "[i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotation marks omitted). The Court has explained, however, that this "presumption may be overcome in some circumstances because the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011) (internal quotation marks and alteration omitted). Accordingly, the Court has identified certain "narrow and well-delineated exceptions to the warrant requirement." *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999).

The appellants acknowledge, as they must, the existence of a well-settled protective sweep exception to the warrant

requirement, as enunciated by the Supreme Court in *Maryland v. Buie*, 494 U.S. 325 (1990). There, following an armed robbery, the police obtained an arrest warrant for Buie and his alleged accomplice. The officers entered Buie's house to execute the arrest warrant, dispersing throughout the first and second floors. After one of the officers shouted into the basement announcing his presence and ordering anyone there to come out, Buie emerged and was apprehended. At some point thereafter, another officer entered the basement "in case there was someone else down there." *Id.* at 328 (internal quotation marks omitted). Although the second officer did not find anyone in the basement, he discovered inculpatory evidence in plain view. Buie was convicted, but the Court of Appeals of Maryland reversed, concluding that a protective sweep of Buie's residence was not justified because the State had not shown that there was "probable cause to believe that a serious and demonstrable potentiality for danger exist[ed]." *Id.* at 329 (internal quotation marks omitted).

The Supreme Court assessed the matter and concluded that "the Court of Appeals of Maryland [had] applied an unnecessarily strict Fourth Amendment standard." *Buie*, 494 U.S. at 336-37. Instead, the Court extended the reasoning of *Terry v. Ohio*, 392 U.S. 1 (1968), and *Michigan v. Long*, 463 U.S. 1032 (1983) — authorizing warrantless on-the-street frisks and roadside searches of passenger areas of vehicles in the interest of officer safety — to the context of an in-home arrest where the danger to law enforcement "is as great . . . if not greater." *See Buie*, 494 U.S. at 333. As the Court explained, "unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf' [where] [a]n ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." *Id.* Thus, the Court identified two constitutionally permissible types of warrantless searches of a residence "after, and while making, [an] arrest." *Id.* at 334.

First, the authorities are entitled to search "incident to the arrest . . . as a precautionary matter and without probable cause or reasonable suspicion, . . . closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie*, 494 U.S. at 334. Second, the officers are entitled to perform a further "protective sweep," beyond the immediately adjoining areas, when they have "articulable facts which, taken together with the rational inferences from which those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* Such a protective sweep is circumscribed, however, extending "only to a cursory inspection of those spaces where a person may be found," and lasting "no longer than it takes to complete the arrest and depart the premises." *Id.* at 335-36.

2.

The government does not assert that the warrantless sweep of the Jones residence, conducted contemporaneously with the arrest of Kipling Jones, constituted a search incident to arrest. As a result, we constrain our analysis to whether the steps taken by the officers conform to a constitutionally permissible protective sweep.[7] The Joneses contend that there were insufficient articulable facts for a reasonably prudent officer to

---

[7]Rather than limiting its position to the protective sweep analysis, the government could have maintained that the search incident to the arrest revealed sufficient evidence — the drug paraphernalia discovered in plain view in the adjoining living room — to obtain a warrant to search the remainder of the residence. *Cf. United States v. Young*, 609 F.3d 348, 354 (4th Cir. 2010) (concluding that drugs observed in plain view while executing arrest warrant in defendant's house provided probable cause to obtain search warrant that led to discovery of other evidence). No such argument has been made, however, and we will not consider it sua sponte. *See United States v. Evans*, 404 F.3d 227, 236 n.5 (4th Cir. 2005) (recognizing that failure to raise argument before trial court waives that contention on appeal).

believe that dangerous individuals were being harbored in their residence. They also stress that there was nothing amiss during their first encounter with the police on the evening in question, and no apparent activity in the residence suggesting the presence of anyone other than the Joneses. The Joneses themselves exhibited nonthreatening behavior, and the officers had exited the front porch, following the first encounter, without being exposed to any perceived danger. Moreover, there was no sign of a meth lab explosion (the initial reason for the police visit) or any other exigent circumstances.[8]

Put succinctly, the Joneses' critique about the lack of exigent circumstances in this case is a red herring. The government concedes there were no exigencies justifying a warrantless search, and the district court properly discounted Officer Smith's testimony that the sweep was conducted, in part, to ascertain whether there had been a meth lab explosion and to see if anyone else had been injured. *See* Order 6, 9-10. Hence, the exigent circumstance exception to the warrant requirement is not at issue. Nor is it relevant that the Joneses were relatively temperate during the first encounter with the officers, and even during the arrest of Kipling Jones. The linchpin of the protective sweep analysis is not "the threat posed by the arrestee, [but] the safety threat posed by the house, or more properly by unseen third parties in the house." *See Buie*, 494 U.S. at 336. In that regard, the fact that the officers had safely exited the front porch after the brief first encounter — when there had been no arrest or other provocation — is not determinative. The question is whether there was a reasonable basis for the officers to believe that there could be other individuals in the residence who might resort

---

[8]The Supreme Court has identified several "exigencies" that might justify a warrantless search of a home. *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). For example, the "emergency aid" exception would permit "officers to enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.*

to violence when incited by their confederate's arrest during the second encounter.

The Joneses nevertheless persist that the officers were acting on no more than a "mere inchoate and unparticularized suspicion or hunch" that other dangerous individuals were lurking in their residence, in that such a suspicion or hunch would not support a warrantless protective sweep. *See Buie*, 494 U.S. at 332 (internal quotation marks omitted). We also appreciate, as certain other courts have recognized, that a "[l]ack of information cannot provide an articulable basis upon which to justify a protective sweep." *United States v. Colbert*, 76 F.3d 773, 778 (6th Cir. 1996); *accord United States v. Moran Vargas*, 376 F.3d 112, 117 (2d Cir. 2004); *United States v. Chaves*, 169 F.3d 687, 692 (11th Cir. 1999). Otherwise, "allowing the police to conduct protective sweeps whenever they do not know whether anyone else is inside a home creates an incentive for the police to stay ignorant as to whether or not anyone else is inside a house in order to conduct a protective sweep." *Colbert*, 76 F.3d at 778. But we are not, in this case, confronted with a situation where there was some lack of information. The district court concluded that there were specific articulable facts underlying the officers' suspicions that other dangerous individuals could be in the Jones residence, reciting that

> recent surveillance of [the Jones] residence revealed known drug users were frequenting the house, some who were known to carry firearms; information that a fugitive from Georgia was staying in the [Jones] residence; and the presence of seven motorized vehicles near the residence and on the property even though [the Joneses] claimed no one else was in the residence.

*See* Order 10.

More specifically, a reasonably prudent officer would sus-
pect that there were other individuals inside the Jones resi-
dence because there were seven vehicles parked on the
property at 1:00 in the morning, yet only the two Joneses were
known to reside there. *Cf. United States v. Tapia*, 610 F.3d
505, 511 (7th Cir. 2010) (upholding protective sweep where
officers had reason to believe other individuals were inside
home in that, inter alia, large vehicle capable of holding sev-
eral persons was parked outside); *United States v. Hauk*, 412
F.3d 1179, 1192 (10th Cir. 2005) (upholding protective sweep
where, inter alia, surveillance showed there was extra vehicle
in driveway and unidentified driver apparently entered home);
*United States v. Tobin*, 923 F.2d 1506, 1513 (11th Cir. 1991)
(upholding protective sweep where officers had reasonable
belief that someone would be hiding in house because three
vehicles were on scene and defendant had lied about codefen-
dant's presence). Of course, it was not merely the number of
vehicles present at the Jones residence that made the officers'
suspicions reasonable; it was the presence of the seven vehi-
cles coupled with Officer Smith's prior surveillance of known
meth users patronizing the Jones residence.[9] Faced with the
possibility that there were other persons inside the house,
there was ample reason to believe that such individuals could
endanger the officers' safety, in that the Joneses were

---

[9]It is immaterial, of course, that the officers did not eventually locate
anyone else in the Jones residence, since "that information was not appar-
ent to [them] when they initiated the sweep." *See United States v. Wil-
liams*, 577 F.3d 878, 881 (8th Cir. 2009). As we have recognized,
"[o]fficers cannot always calibrate the scope of unanticipated hazards,
whether from confederates or from firearms or from the structure and lay-
out of the house itself." *United States v. Montieth*, No. 10-4264, slip op.
at 11, ___ F.3d ___ (4th Cir. Dec. 5, 2011). Accordingly, we deny the
Joneses' belated motion for judicial notice of Craig Wolford's October
2007 conviction in Georgia and resulting sentence of imprisonment until
July 2009. Even if such matters were subject to judicial notice, Officer
Smith testified that he learned of the possibility that Wolford was staying
at the Jones residence from a confidential informant. That was Smith's
understanding at the time of the protective sweep of the Jones residence,
regardless of whether Wolford may actually have been in custody.

involved in the production and distribution of meth; at least one of their patrons was known to carry a firearm; and a fugitive was reportedly staying in the residence. *Cf. United States v. Lawlor*, 406 F.3d 37, 42 (1st Cir. 2005) (upholding protective sweep where, inter alia, "house and its occupants were involved in illegal, drug-related activities" and "over the years, [the officer] had observed 'individuals coming and going from th[e] house'"); *United States v. Cavely*, 318 F.3d 987, 996 (10th Cir. 2003) (upholding protective sweep where, "[a]mong other things, the officers had a clear indication of on-going methamphetamine production at the house"); *Wyler v. United States*, 725 F.2d 156, 160 (2d Cir. 1983) (upholding protective sweep given dangerousness of fugitive "twice convicted of serious violations of federal narcotics laws"). Such articulable facts, "taken together with the rational inferences from those facts" made by law officers, and construed in the light most favorable to the government, are more than sufficient to justify the protective sweep in this case.[10]

---

[10]Our ruling today is not affected by the Joneses' contention that Kipling Jones was actually arrested just outside the residence, on the front porch. The district court found that the arrest occurred "in the open doorway of the residence." *See* Order 5, 9. The Joneses did not argue otherwise in their briefs on appeal, and thus failed to establish that the court's finding was clearly erroneous. We nevertheless agree with the court that the protective sweep conducted in this case was permissible, even if we were to assume that Mr. Jones was outside the front door when he was arrested. Although the *Buie* case involved a protective sweep incident to an in-home arrest, virtually all of our sister circuits have recognized that the *Buie* protective sweep doctrine applies to an arrest occurring just outside a residence. *See, e.g.*, *United States v. Paopao*, 469 F.3d 760, 765-67 (9th Cir. 2006) (collecting cases); *Sharrar v. Felsing*, 128 F.3d 810, 824 (3d Cir. 1997), *abrogated on other grounds by Curley v. Klem*, 499 F.3d 199 (3d Cir. 2007); *United States v. Tobin*, 923 F.2d 1506, 1513 (11th Cir. 1991); *see also United States v. Davis*, 471 F.3d 938, 945 (8th Cir. 2006); *United States v. Burrows*, 48 F.3d 1011, 1016 (7th Cir. 1995). As many of these courts have reasoned, "an arrest that occurs just outside the home can pose an equally serious threat to arresting officers as one that occurs in the home." *See United States v. Lawlor*, 406 F.3d 37, 41 (1st Cir. 2005). We have heretofore implicitly approved of such reasoning, *see United States v. Green*, 599 F.3d 360, 376 n.16 (4th Cir. 2010), and are satisfied to do so more explicitly here.

B.

Pursuant to his plea agreement with the government, Kipling Jones waived his right to appeal his sentence, subject to certain exceptions not applicable here. Nevertheless, the government does not seek to enforce the waiver, and we will not sua sponte enforce it. *See United States v. Brock*, 211 F.3d 88, 90 n.1 (4th Cir. 2000) (declining to consider appeal waiver that arguably barred appeal where government had expressly elected not to pursue waiver contention); *United States v. Metzger*, 3 F.3d 756, 757-58 (4th Cir. 1993) (concluding that government's failure to assert appeal waiver as bar to appeal precludes government from relying on it). The government also concedes that Mr. Jones is entitled to resentencing in light of our decision in *United States v. Simmons*, 649 F.3d 237 (4th Cir. 2011) (en banc). As we have previously explained, however, such a concession does not necessarily end our inquiry, "as we are not at liberty to vacate and remand for resentencing on the Government's concession of error alone." *See United States v. Rodriguez*, 433 F.3d 411, 414 n.6 (4th Cir. 2006) (citation omitted).

Assessing the impact of *Simmons* in these circumstances, we are satisfied that Kipling Jones's prior North Carolina conviction for "Possession With Intent to Manufacture/Sell/Deliver a Controlled Substance" and "Possession of a Precursor Chemical With Intent to Manufacture," *see* J.A. 395 (the "predicate offense"), was not punishable by a term of imprisonment exceeding one year. The predicate offense therefore does not qualify as a prior felony conviction for purposes of the career offender provision. Because Mr. Jones had only one prior felony conviction at the time of his sentencing, he was not subject to the career offender sentencing enhancement and his 292-month sentence is above the applicable Guidelines range. As acknowledged in his plea agreement, Mr. Jones faced a statutory minimum of 120 months and a maximum of life, given the agreed upon drug amount of more than 50 grams but less than 200 grams of methamphetamine.

*See* 21 U.S.C. § 841(b)(1)(A)(viii). Absent the career offender enhancement, however, the government concedes that the correct Guidelines range would have been below the statutory minimum, and his Guidelines sentence is thus the mandatory minimum of 120 months. *See* USSG § 5G1.1(b) ("Where a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutorily required minimum sentence shall be the guideline sentence."). In these circumstances, we are satisfied that the *Simmons* principles warrant a remand.

## IV.

Pursuant to the foregoing, we affirm the convictions of both defendants, vacate Kipling Jones's sentence, and remand for resentencing.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*