**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 22-4221**

———————

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JONG WHAN KIM,

Defendant - Appellant.

———————

Appeal from the United States District Court for the Eastern District of North Carolina, at Wilmington.  Louise W. Flanagan, District Judge.  (7:18-cr-00200-FL-1)

———————

Argued:  May 5, 2023                    Decided:  June 20, 2023

———————

Before AGEE, Circuit Judge, TRAXLER, Senior Circuit Judge, and Henry E. HUDSON, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

———————

Affirmed by published opinion. Senior Judge Traxler wrote in the opinion, in which Judge Agee and Judge Hudson joined.

———————

**ARGUED:**  Michelle Ann Liguori, ELLIS & WINTERS, LLP, Raleigh, North Carolina, for Appellant.  Andrew Kasper, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:**  Scottie F. Lee, ELLIS & WINTERS LLP, Greensboro, North Carolina, for Appellant.  Michael F. Easley, Jr., United States Attorney, David A. Bragdon, Assistant United States Attorney, Kristine L. Fritz, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

TRAXLER, Senior Circuit Judge:

Federal law prohibits the knowing or intentional distribution of a controlled substance "[e]xcept as authorized." 21 U.S.C. § 841(a). Jong Whan Kim, a medical doctor, pleaded guilty to multiple charges under § 841 for prescribing oxycodone and other controlled substances outside the usual course of professional practice and without a legitimate medical need. *See* 21 C.F.R. § 1306.04(a) ("A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. . . ."). After Kim was sentenced, the Supreme Court issued its decision in *Ruan v. United States*, 142 S. Ct. 2370 (2022), which held that the statutory knowing-or-intentional *mens rea* applies not only to the distribution-related elements of the crime, but also to the question of authorization. Accordingly, if a defendant charged under § 841 "produces evidence that he or she was authorized to dispense controlled substances, the Government must prove beyond a reasonable doubt that the defendant knew that he or she was acting in an unauthorized manner, or intended to do so." *Id.* at 2375.

Before *Ruan* was decided, this circuit (and others) had held that whether a doctor's actions were authorized was an objective inquiry. *See, e.g.*, *United States v. Hurwitz*, 459 F.3d 463, 479 (4th Cir. 2006). Because *Ruan* changed the law in this circuit, Kim contends that his guilty plea must be set aside because the district court did not inform him that the government would be required to prove that he knew he was acting in an unauthorized manner when issuing the challenged prescriptions. Kim also contends that the district court

2

failed to afford him an adequate opportunity to allocute before imposing sentence. Finding no reversible error, we affirm.

I.

Kim was born in South Korea in 1949. He joined the Korean military and fought alongside American forces in the Vietnam war. He immigrated to the United States when he was 27. In Wisconsin, Kim got married and had three children. He worked in a factory and as a gardener to support his family. Kim obtained a bachelor's degree from the University of Wisconsin in 1991 and received his medical degree in 1995.

After working for several years in a hospital in Pennsylvania, Kim was hired in 2002 as a hospitalist in Elizabethtown, North Carolina. The hospital eventually became concerned about Kim's practices for prescribing controlled substances. Hospital officials met with Kim in December 2016 and informed him that his treatment notes did not justify the prescriptions he was issuing. Kim was given the option of complying with the hospital's requirements or resigning; he chose to resign in March 2017.

After leaving the hospital, Kim began seeing patients at his home in Bladenboro, North Carolina. In the summer of 2017, the still-married Kim started dating Tammy Thompson, who then began helping Kim run his home-based medical practice.[1] In

---

[1] Kim met Thompson in the early 2000s, when he was the primary care physician for Thompson's then-husband. Thompson's husband had been in an accident, and Kim prescribed him opiates in such large quantities that Thompson's son became concerned.

3

September 2017, Kim opened a medical clinic in Tabor City, North Carolina. Thompson was Kim's business partner and served as the clinic's office manager.

The information in the record shows that the clinic operated as a classic pill mill. Beyond a scale, blood-pressure cuffs, and a stethoscope, there was no medical equipment at the clinic. Kim issued prescriptions for strong pain medication without reviewing the patient's prior medical records and without performing a proper examination to determine if medication was required.  Although the clinic did perform drug tests on new patients, the results were not properly documented in the patients' files, and Kim issued prescriptions even if the patient failed the drug test.

The clinic saw between 35 and 40 patients a day, and those patients frequently reeked of marijuana. Thompson and her daughter, who also worked at the clinic, would sometimes let a particular person (who was not a patient) bring a group of prospective patients to the clinic, and Kim would issue prescriptions to the group. Patients who brought other prospective patients would be seen more quickly. All patients paid in cash (usually $200), regardless of insurance status, and clinic employees were also paid in cash. The cash paid by the patients was placed by clinic employees in one of two lock boxes. At the end of each day, Thompson would gather the money from the lock boxes and deposit it at one of two banks. An employee of one of the banks told law enforcement that Thompson usually made deposits ranging between $5,000 and $8,000 twice a week.

The clinic was located next to Tabor City Elementary School. The clinic parking lot was often filled with patients waiting to be seen, which created safety concerns for the

4

school. The school frequently cancelled recess because of activity at the clinic, and it was forced to lock down more than once.

In 2018, law enforcement had a confidential informant pose as a clinic patient. The CI saw Kim twelve times. Kim conducted a drug screen on the first visit, but not thereafter. At each appointment, the CI paid $200 in cash and Kim issued prescriptions after minimal or no medical examination. At several appointments, the CI also purchased marijuana from Thompson. On one occasion when the CI was in the examination room with Kim, Thompson brought the marijuana into the room and sold it to the CI in front of Kim. In Kim's presence, she told the CI that Kim was willing to trade work for prescriptions.

In May 2018, the CI asked Kim to prescribe stronger medication, and Kim complied with no examination and no questions asked. At the CI's last clinic visit in June 2018, the CI asked Kim for a higher dosage of the medication so he could sell more pills on the street. The CI and Kim also discussed which pharmacy the CI should use to ensure that the prescription would not be recorded. At the CI's request, Kim also issued a prescription for the CI's father, who was not present at the appointment and had never been seen by Kim. The CI paid Kim $200 for the prescription issued in his name and $300 for the prescription issued in his father's name.

The day after his last clinic visit, the CI conducted a final controlled purchase from Kim and Thompson at Kim's residence, paying $700 for 81 hydrocodone pills and a quantity of marijuana. At this visit, Kim and the CI discussed the possibility of the CI lending Kim money to buy a house. Kim offered to pay the interest through prescriptions

5

to the CI. The next day, law enforcement officials arrested Kim and Thompson on state charges and executed search warrants for the clinic and Kim's residence.

In December 2018, Kim and Thompson were indicted on federal charges, including a charge of conspiracy to distribute controlled substances and multiple individual counts of drug distribution. The case proceeded slowly through the system, as dates for trial were set and then later extended. In July 2020, the government filed a superseding indictment including additional counts against Kim and Thompson. A 34-count second superseding indictment was filed on July 7, 2021. In addition to the conspiracy charge asserted against Kim and Thompson, the second superseding indictment included twenty-five substantive counts involving Kim alone; six substantive counts involving Thompson alone[2]; and two substantive counts involving both Kim and Thompson. Less than a week after the second superseding indictment was filed, Thompson pleaded guilty to conspiracy and five of the individual counts.

In November 2021, Kim signed a written agreement whereby he agreed to plead guilty to conspiracy and eight substantive counts in exchange for the dismissal of the remaining counts. At the plea hearing conducted on November 30, 2021, Kim testified that he had read the second superseding indictment, understood the charges, and was prepared to plead guilty. When the court listed the relevant counts and asked Kim how he pleaded, Kim responded, "I plead guilty to those charges, Your Honor." J.A. 68.

---

[2]    The individual counts against Thompson were based on her selling marijuana to patients.

After the government spelled out the penalties Kim faced on each charge, Kim repeated that he was pleading guilty to the charges outlined in the plea agreement. The court explained the elements of each offense, asked the government to present the factual basis, and then asked Kim if he committed the offenses listed in the plea agreement. Kim responded, "Your Honor, nothing I was doing willfully. I'm not guilty of any of this, Your Honor. I was just advised by my counsel that this is the only way I can alleviate – mitigate my sentence." J.A. 86. After speaking with his client, counsel for Kim informed the court that he was "not in a position today to enter a guilty plea," J.A. 87, and requested a continuance "to give me some more time with Dr. Kim to try to answer and clarify questions he's raised." J.A. 87. The court granted the continuance and struck the existing plea agreement from the record.

The parties returned to court on December 28, 2021, with a freshly executed plea agreement.[3] The court explained that the hearing was a continuation of the prior hearing, and Kim declined the court's offer to repeat any of the information from the first hearing about the charges, penalties, and the rights he was giving up. After the government spelled out the factual bases for the charges, the court reiterated to Kim that if the court accepted the plea agreement, "you can't take it back. You're bound by it." J.A. 104. Kim stated that he understood. The district court then asked Kim if he was in fact guilty of the charges spelled out in the plea agreement, to which he responded, "Yes, your Honor." J.A. 104.

---

[3]    Under the revised agreement, the government agreed to dismiss Count 34, one of the counts to which Kim had originally agreed to plead guilty.

The court determined that Kim knowingly and voluntarily pleaded guilty, and the court accepted the plea agreement. At a subsequent hearing, the court sentenced Kim to a total term of 78 months' imprisonment. This appeal followed.[4]

## II.

We turn first to the *Ruan* question. "A plea of guilty is constitutionally valid only to the extent it is voluntary and intelligent. We have long held that a plea does not qualify as intelligent unless a criminal defendant first receives real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process." *Bousley v. United States*, 523 U.S. 614, 618 (1998) (cleaned up). To ensure that defendants plead guilty knowingly and voluntarily, the Federal Rules of Criminal Procedure require a district court, before accepting a guilty plea, to "inform the defendant of, and determine that the defendant understands, . . . the nature of each charge to which the defendant is pleading." Fed. R. Crim. P. 11(b)(1)(G).

Kim contends his plea was not valid because the district court did not inform him that, if he went to trial, the government would be required to prove beyond a reasonable doubt that Kim subjectively knew or intended that his conduct was unauthorized, as required by *Ruan*. Because Kim raised no objections below, we review for plain error only. Under plain error review, Kim is entitled to relief only if he can

---

[4] Although Kim's plea agreement includes an appeal waiver, we nevertheless proceed because the government has not sought to enforce the waiver. *See United States v. Jones*, 667 F.3d 477, 486 (4th Cir. 2012) ("[T]he government does not seek to enforce the waiver, and we will not sua sponte enforce it.").

satisfy three threshold requirements. *First*, there must be an error. *Second*, the error must be plain. *Third*, the error must affect substantial rights, which generally means that there must be a reasonable probability that, but for the error, the outcome of the proceeding would have been different. If those three requirements are met, an appellate court may grant relief if it concludes that the error had a serious effect on the fairness, integrity or public reputation of judicial proceedings.

*Greer v. United States*, 141 S. Ct. 2090, 2096 (2021) (cleaned up). Kim bears the burden of persuasion at each step of the inquiry; "[s]atisfying all four prongs of the plain-error test is difficult." *Id.* at 2097 (cleaned up).

Kim contends that the district court plainly erred because it never expressly informed Kim that the government at trial would be required to prove that Kim knew or intended that his prescriptions were not authorized and that he would not have pleaded guilty if he had understood the government's burden of proof. While the government acknowledges that *Ruan* changed the law in this circuit, it disagrees with Kim at every step of the plain-error path. In the government's view, there was no error at all, let alone plain error. In any event, the government contends that Kim cannot show his substantial rights were affected.

## A.

We first consider whether there was error, and, if so, whether the error was plain. "Deviation from a legal rule is 'error' unless the rule has been waived." *United States v. Olano*, 507 U.S. 725, 732–33 (1993). An error is "plain" if the error is "clear" or "obvious." *Id.* at 733.

In the plea colloquy, the district court explained that for the conspiracy count, the government was required to prove that Kim "formed an agreement to distribute, prescribe,

9

and dispense and possess with the intent to distribute [specified controlled substances], and that you knew the purpose of this agreement or conspiracy, and that you knowingly and willfully participated in or became a part of it." J.A. 72-73. As to the substantive counts, the court explained that the government bore "the burden of showing beyond a reasonable doubt that you prescribed, dispensed, or distributed [a specified controlled substance]; you acted knowingly, intentionally; and you did that outside the usual course of professional practice and for other than a legitimate medical purpose." J.A. 73.

Kim argues that because the district court did not expressly state that the government would be required to prove that he knew or intended that his prescriptions were unauthorized, as required by *Ruan*, the court failed to inform him of the true nature of the charges against him and therefore committed plain error. *See Johnson v. United States,* 520 U.S. 461, 468 (1997) ("[W]here the law at the time of trial was settled and clearly contrary to the law at the time of appeal[,] it is sufficient that the error be plain at the time of appellate consideration.").

The government, however, insists that the district court's explanation was entirely consistent with *Ruan*. The government contends that when the district court stated "'you did ***that*** outside the usual course of professional practice,' the court incorporated the *mens rea* requirement that it had just read." Br. of Appellee at 21.

We need not decide whether the district court's explanations should be understood in the manner suggested by the government. While the Constitution requires that the defendant understand the true nature of the charges he faces, that does not mean that a recitation of all elements is always required in a Rule 11 proceeding. This court "has

10

repeatedly refused to script the Rule 11 colloquy . . . to require the district courts to recite the elements of the offense in every circumstance." *United States v. Wilson*, 81 F.3d 1300, 1307 (4th Cir. 1996). Moreover, there is no requirement that the defendant receive all of the information about the nature of the charges from the court "at the plea hearing itself." *United States v. DeFusco*, 949 F.2d 114, 117 (4th Cir. 1991) (cleaned up). Instead, the district court may rely on "detailed information received [by the defendant] on occasions before the plea hearing" when determining whether a guilty plea is knowing and voluntary. *Id.* (cleaned up).

In this case, even if the district court's explanation of the charges alone did not properly reflect the *mens rea* required by *Ruan*, the language of the *indictment* does reflect *Ruan*'s holding. This court has made it clear that when explaining the nature of the charges, a district court may rely on the defendant's sworn statement that he has read the indictment and discussed it with his attorney. *See Wilson*, 81 F.3d at 1307 ("We again refuse to require the district courts to recite the elements of the offense in every circumstance. *In many cases, such a procedure would be a formality and a needless repetition of the indictment*, which often tracks the essential elements of the offense.") (emphasis added).

In each count of the second superseding indictment that involved Kim, the government, apparently anticipating what *Ruan* would hold, alleged that Kim conspired and issued the challenged prescriptions "*while acting and intending to act outside the usual course of professional practice and not for a legitimate medical purpose.*" J.A. 39, 40, 41, 43 (emphasis added). *Ruan* requires the government to prove that the defendant knew or intended to issue unauthorized prescriptions. Because a prescription issued outside the

11

usual course of medical practice and not for a legitimate medical purpose is an unauthorized prescription, *see* 21 C.F.R. § 1306.04(a), the indictment is consistent with the requirements of *Ruan*.

Kim argues that the language of the second superseding indictment is irrelevant because governing Fourth Circuit law at the time of his plea was not consistent with *Ruan*, which, in Kim's view, means that he did not plead guilty to any *Ruan*-compliant offense. We disagree. Kim did not plead guilty to generic charges under § 841; he pleaded guilty to the offenses spelled out in the second superseding indictment. In every count of that indictment, the government alleged that Kim intended to act outside the usual course of professional practice and not for a legitimate medical purpose. While Fourth Circuit precedent did not then require the government to prove the defendant's subjective intent, the government nonetheless would have been bound by those allegations at trial. *See United States v. Pinson*, 860 F.3d 152, 171 (4th Cir. 2017) ("Importantly, the government is bound by the phrasing it uses in the indictment, even if it chooses to use more specific language than necessary.").

Kim also contends that the language of the indictment is not sufficient under *Ruan* because it does not make clear that the government bears the burden of proving that Kim intended to issue unauthorized prescriptions. While the indictment does not mention (and would not be expected to mention) the burden of proof, the district court in the plea

12

colloquy repeatedly informed Kim that the government bore the burden of proof at trial.[5]

We believe that those repeated explanations, combined with the *mens rea* allegations

actually contained in the indictment, were sufficient.

As we explained in *DeFusco*, the question is not simply whether the court recited

each element of each charge at the plea hearing, but whether the district court ensured that

Kim understood the true nature of the charges. *See DeFusco*, 949 F.2d at 117 ("[T]he

defendant must receive notice of the true nature of the charge rather than a rote recitation

of the elements of the offense. . . ."). When determining whether a plea hearing complies

with the requirements of Rule 11, we are obligated to "accord deference to the trial court's

decision as to how best to conduct the mandated colloquy with the defendant. The manner

of ensuring that the defendant is properly informed is committed to the good judgment of

the district court, to its calculation of the relative difficulty of comprehension of the charges

and of the defendant's sophistication and intelligence." *Id.* at 116 (cleaned up).

In this case, the district court was presented with a mature, well-educated,

financially successful defendant who had no mental health conditions or substance abuse

---

[5] *See* J.A. 63 (explaining to Kim that if he went to trial, "there would be no burden on you. The burden rests on the shoulders of the government to prove you guilty beyond a reasonable doubt."); J.A. 64 ("[Y]ou are and would be presumed innocent. Again, you don't have to prove anything."); J.A. 72 (After Kim stated that he was pleading guilty, the district court explained, "Dr. Kim, you still have the right to plead not guilty. . . . The government still has the burden on its back to prove you guilty beyond a reasonable doubt. You are presumed innocent. You remain presumed innocent. And the government's burden, as I said, remains with it."); J.A. 91 (explaining at the beginning of the second plea hearing that "[t]he burden remains on the government to prove you guilty beyond a reasonable doubt. And you are presumed innocent.").

problems. *See id.* at 117 ("In explaining the nature of the charges to the defendant, . . . the trial court is given a wide degree of discretion in deciding the best method to inform and ensure the defendant's understanding. The trial court may look at the availability of counsel, and the defendant's personal characteristics, such as age, education, and intelligence.") (cleaned up). Kim told the district court during the first plea colloquy that he understood and could communicate with his attorney and that he was satisfied with his attorney. He confirmed that he had read the second superseding indictment and that his attorney had explained it to him. As noted, the indictment's *mens rea* allegations were consistent with the requirement of *Ruan*, and the district court repeatedly informed Kim that the burden of proof was on the government. When the parties reconvened a month after the aborted plea hearing, Kim informed the court that he did not need the indictment to be read to him. He confirmed that he had read and signed the revised plea agreement, which spelled out the facts underlying the charges against him, and he confirmed that he was in fact guilty of the charges listed in the plea agreement. Under these circumstances, we find no error, plain or otherwise, in the manner in which the district court ensured Kim's understanding of the true nature of the charges he faced.

### B.

Moreover, even if we could find error in the district court's approach, we agree with the government that Kim cannot show that his substantial rights were affected.

Because Kim pleaded guilty, the substantial-rights inquiry requires him to "show[] that, if the District Court had correctly advised him of the *mens rea* element of the offense, there is a reasonable probability that he would not have pled guilty." *Greer*, 141 S. Ct. at

14

2097 (cleaned up). "Although the reasonable probability standard is a demanding one, a defendant need not prove by a preponderance of the evidence that but for error things would have been different." *United States v. Lockhart*, 947 F.3d 187, 192–93 (4th Cir. 2020) (en banc) (cleaned up). "Instead, a defendant must satisfy the judgment of the reviewing court, informed by the entire record, that the probability of a different result is sufficient to undermine confidence in the outcome of the proceeding." *Id.* (cleaned up).

In support of his claim that he would not have pleaded guilty if he had understood that the government would be required to prove that he knew he was issuing prescriptions outside the usual course of professional practice and not for a legitimate medical purpose, Kim points to his initial hesitancy to plead guilty and his assertion in the first hearing that he did nothing willfully and was "not guilty of any of this." J.A. 86. He also points to the government's statements of the factual bases for the charges, which Kim contends did not include evidence of Kim's subjective intent for each prescription at issue. We are not persuaded.

Although Kim expressed hesitancy in the first plea hearing, an isolated hiccup in the course of a plea proceeding does not automatically satisfy the substantial-rights prong of the plain-error inquiry. Kim expressed no further hesitancy when court reconvened several weeks after the initial hearing. He responded in the negative when the district court asked if he needed any other information from the court or had questions for his attorney, and he confirmed that he was in fact guilty of the charges listed in the plea agreement. Under these circumstances, the mere fact that Kim was briefly hesitant to plead guilty is insufficient to carry Kim's burden under plain-error review.

15

When determining whether a plain-error defendant has established that he would have gone to trial but for the error, we are entitled to consider the strength of the government's evidence and to ask "what [the defendant] might ever have thought he could gain by going to trial." *United States v. Dominguez Benitez*, 542 U.S. 74, 85 (2004).

> The point of the question is not to second-guess a defendant's actual decision; if it is reasonably probable he would have gone to trial absent the error, it is no matter that the choice may have been foolish. The point, rather, is to enquire whether the omitted [explanation] would have made the difference required by the standard of reasonable probability. . . .

*Id.*

Although the record reveals no statement from Kim directly stating his subjective intention to violate the law, the mountain of circumstantial evidence leaves little doubt. For example, the record shows that Kim complied when the CI asked Kim to prescribe a higher strength of medication so he could sell more pills on the street. Kim likewise complied when the CI asked for a prescription for his father, who was not a patient of Kim's and was not present at the appointment. Kim did not correct Thompson when she told the CI, in Kim's presence, that Kim would trade work for prescriptions, and Kim asked the CI about a possible loan and offered to write prescriptions to pay the interest. In the face of this evidence, a jury would be highly unlikely to conclude that Kim subjectively believed he was issuing authorized, medically necessary prescriptions, which in turn makes it unlikely that Kim's plead-or-trial calculation would turn on the precise contours of the statutory *mens rea* requirements.

Moreover, counsel for Kim told the court at sentencing that once he got involved in the case and explained the government's evidence, Kim and his children "pretty quickly

16

acknowledged that he, in fact, was guilty." J.A. 120-21. Counsel explained that Kim's difficulty came from "his deep shame for this conduct" for bringing "dishonor to his family." J.A. 121.

> [I]t was very difficult for Dr. Kim to overcome that sense of absolute shame and dishonoring in his family. Part of what helped us in that are his own children telling him that he's a grandfather, and their father, and they didn't want him to die in prison, Your Honor. They wanted him to have time with his family.
>
> And so ultimately he came before the Court and pled guilty.

J.A. 121.

In our view, these statements undermine Kim's claim that he would not have pleaded guilty if he had understood the government's obligation to prove he knew his prescriptions were not authorized. While pleading guilty would not eliminate the dishonor that Kim perceived, proceeding to trial would invite even more public attention on the specifics of Kim's actions, including details about his extra-marital relationship with Thompson. Given the slim likelihood that a jury would agree that Kim believed he was writing proper prescriptions, we have difficulty seeing how a more fulsome explanation of the government's burden to prove *mens rea* "could have had an effect on [Kim's] assessment of his strategic position." *Dominguez Benitez*, 542 U.S. at 85.

After reviewing the record as a whole, we agree with the government that Kim has not established a reasonable possibility that he would not have pleaded guilty if the charges

17

against him had been more fully explained. Because Kim cannot show that his substantial rights were affected, he is not entitled to relief under plain-error review.[6]

### III.

Finally, we turn briefly to Kim's claim that the district court violated his right to address the court before sentence is imposed. Because Kim did not object below, this issue is likewise reviewed for plain error. *See United States v. Muhammad*, 478 F.3d 247, 249 (4th Cir. 2007).

The Rules of Criminal Procedure provide that, "[b]efore imposing sentence, the [district] court must . . . address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence." Fed. R. Crim. P. 32(i)(4)(A)(ii). "This rule is not satisfied by merely affording the Defendant's counsel the opportunity to speak." *Muhammad*, 478 F.3d at 249 (cleaned up).

Kim concedes that while the district court did "eventually" give him an opportunity to speak, that opportunity was insufficient because the district court by then had already "express[ed] its views on the extent of Mr. Kim's moral culpability." Br. of Appellant at 40.

---

[6]      Because conspiracy involves "an agreement with the specific intent that the underlying crime be committed by some member of the conspiracy," *Ocasio v. United States*, 578 U.S. 282, 288 (2016) (cleaned up), the government also contends that Kim's admission of guilt to the conspiracy count renders harmless any error in the explanation of the substantive counts. Given our conclusion that Kim failed to establish a reasonable probability that he would not have pleaded guilty if the charges had been properly described, we need not consider this argument.

18

Kim's argument is functionally identical to an argument this court has already rejected. In *United States v. Engle*, 676 F.3d 405 (4th Cir. 2012), the defendant argued that his opportunity to allocute was meaningless because it came *after* the district court had announced its intention to impose an upward variance. We disagreed:

> Rule 32 only requires the district court to address the defendant personally and permit him to speak or present any information to mitigate the sentence before sentence is imposed; apart from that requirement, *the rule does not create a right of allocution at any specific point in the sentencing proceeding.* Moreover, when a judge announces a sentence before hearing an allocution, it is fair to assume that such a sentence is tentative and that the judge will consider the defendant's statements before imposing a final sentence.

*Id.* at 425 (cleaned up) (emphasis added).

There was nothing improper in *Engle* about the court expressing preliminary views as to the appropriate sentence before hearing from the defendant, and there was nothing improper here about the court expressing its views about the costs and societal harms of Kim's conduct before hearing from him. Because the district court afforded Kim the opportunity to address the court before the court imposed sentence, Kim cannot establish the existence of error, much less plain error.

## IV.

Accordingly, for the foregoing reasons, we hereby affirm Kim's conviction and sentence.

*AFFIRMED*

19